# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION
### CIVIL ACTION NO. 3:24-CV-00737-RGJ

JULIA C. KING                                                                    PLAINTIFF

VS.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY                                                               DEFENDANT

## MEMORANDUM OPINION AND ORDER

In this denial-of-insurance-benefits case, the Parties have filed competing motions to compel discovery. Defendant Northwestern Mutual Life Insurance Company ("Defendant") has moved to compel Plaintiff Julie C. King ("Plaintiff") to identify her medical providers and execute a medical authorization, as well as produce "notebooks" described in Plaintiff's audio recordings with Defendant's representatives. (DN 27). Plaintiff has moved to compel Defendant to produce ESI data and other documents in their native formats, to amend its objections as to whether responsive documents are being withheld pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), and to produce documents responsive to over a dozen of Plaintiff's discovery requests. (DN 28).

These Motions are fully briefed (*see* DN 29; DN 30; DN 31; DN 32) and have been referred to the undersigned United States Magistrate Judge for adjudication pursuant to 28 U.S.C.§ 636(b)(1)(A) (DN 9).

## I. Background

In late 2020, Plaintiff was approached by Defendant's Kentucky agent, Ralph Barringer, to purchase a disability income policy. (DN 1-1, at ¶ 11). In applying, Plaintiff completed a medical history questionnaire. (*Id.*). Plaintiff alleges that Barringer and his staff did not read and ask her

each of the questions on the questionnaire but, instead, generally asked about her prior medical conditions. (*Id.* at ¶ 14). Plaintiff says she answered these questions honestly and to the best of her knowledge and signed the application in good faith that her answers were accurately recorded. (*Id.* at ¶¶ 15-16).

Defendant approved and issued a disability income insurance policy ("the Policy"), with a "Policy Date" of February 15, 2021 and a "Date of Issue" of February 26, 2021. (*See* DN 1-1, at ¶¶ 18). The Policy had a "contestability provision," stating that once the Policy has been in force for two years from the Date of Issue, only a fraudulent misrepresentation in the application may be used to rescind the Policy or to deny a claim. (*Id.* at ¶ 24).

While riding her motorcycle on August 5, 2023, Plaintiff was struck in the head by a bird. (*Id.* at ¶ 27). The resulting impact cracked Plaintiff's helmet, causing her to suffer a traumatic brain injury. (*Id.*). Following this incident, Plaintiff submitted a claim under the Policy with Defendant for disability income benefits. (*Id.* at ¶ 29).

Defendant denied Plaintiff's claim, arguing her application for the Policy was incomplete because it included material misrepresentations regarding her medical conditions. (*Id.* at 30-31; DN 7, at ¶ 6). Specifically, Defendant says it "received medical records from various providers revealing undisclosed medical information including, among other things, treatment for back pain, neck pain, and myofascial pain from September 2019 through February 2021[,]" as well as "undisclosed medical information revealing treatment for anxiety disorder, ADHD, and other undisclosed conditions." (DN 7, at PageID # 46, ¶¶ 16-17). Under the "contestability provision" of the Policy, Defendant sought to mutually rescind the Policy and provided Plaintiff with a check for her previously paid premiums. (DN 1-1, at ¶ 32; DN 7, at ¶¶ 21). Plaintiff rejected Defendant's offer of mutual rescission. (DN 1-1, at ¶ 34).

Plaintiff then filed this suit to enforce her rights under the Policy and asserted claims of breach of contract and bad faith against Defendants.[1] (*See id.*). Defendant denies Plaintiff's allegations of wrongful conduct and maintains that Plaintiff knowingly misrepresented her health and treatment history when applying for the Policy. (DN 7). Defendant asserts a counterclaim for declaratory and equitable relief in the form of an order rescinding the Policy. (*Id.*).

The Court bifurcated Plaintiff's breach-of-contract claim and Defendant's rescission counterclaim from Plaintiff's bad faith claims and stayed discovery on Plaintiff's bad-faith claims pending resolution of the breach-of-contract and rescission claims. (DN 15).

Several months into fact discovery, the Parties contacted the Court to schedule a telephonic conference regarding numerous disputes. (*See* DN 21). The Court encouraged the Parties to continue meeting and conferring on these issues for ten days and file a joint status report, updating the Court on any agreements reached and any remaining issues. (DN 22). After the Parties reported that a handful of their disputes persisted, the Court held another telephonic conference, and then ultimately allowed the Parties to file motions to compel on an expedited briefing schedule. (*See* DN 23; DN 24).

## II. Legal Standard

Trial courts have wide discretion in resolving discovery issues. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). The scope of discovery is defined in Federal Rule of Civil Procedure 26(b)(1) as "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). Federal courts broadly construe this language to include "any matter that bears on, or that reasonably could lead to other matter[s] that could bear

---

[1] Plaintiff asserts common law bad faith claims (breach of covenant of good faith and fair dealing) and statutory bad faith claims (KRS 304.12-230 and KRS 304.12-235).

on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The broad scope of discovery is not without limits, however. Courts must consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

### III. Claims and Defenses

Because the scope of discovery is tethered to the Parties' claims and defenses, the Court first reviews the elements of the claims at issue.

A claim for breach of contract in Kentucky requires proof of "(1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cnty. Gov. v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009); *Murphy v. RoundPoint Mortg. Serv. Corp.*, 778 F.Supp.3d 895, 901 (W.D. Ky. 2025) (citing *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019)).

Claims of rescission are governed by KRS 304.14-110, which provides that "misrepresentations, omissions, and incorrect statements" on an application for insurance policy can preclude recovery if those representations are:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract . . . if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

4

KRS 304.14-110. This statute "reflects a public policy requiring 'those who apply for insurance [to] be honest and forthright in their representations.'" *Progressive N. Ins. Co. v. Corder*, 15 S.W.3d 381, 383 (Ky. 2000). "[A] false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of . . . insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated therein." *Cook v. Life Invs. Ins. Co. of Am.*, 126 F. App'x 722, 724 (6th Cir. 2005) (quoting *Mills v. Rsrv. Life Ins. Co.*, 335 S.W.2d 955, 958 (Ky. 1960)).

Kentucky has long recognized a defense to rescission where "the insurer was fully cognizant of all the facts" when it relied upon an insured's alleged misrepresentation on an application. *Lincoln Income Life Ins. Co. v. Burchfield*, 394 S.W.2d 468, 470 (Ky. 1965); *see also State Farm Mut. Auto. Ins. Co. v. Crouch*, 706 S.W.2d 203, 206 (Ky. Ct. App. 1986) ("[U]nder *State Auto Mutual Ins. Co. v. Spray*, 547 F.2d 397 (7th Cir. 1977) (interpreting Kentucky law), an insurer must have clear notice and full cognizance of the true facts to be bound by its policy.").

### IV. Defendant's Motion to Compel (DN 27)

#### A. Discovery Regarding Plaintiff's Medical Providers

Defendant asked Plaintiff to identify all medical providers with whom she sought or received treatment before applying for the Policy and asked Plaintiff to execute an authorization allowing the providers to release Plaintiff's treatment records. (DN 27-1, at PageID # 154). Plaintiff objected that the request did not seek "relevant evidence or information likely to lead to relevant evidence" and stated the "only relevant records are already in Northwestern's possession." (*Id.*). Plaintiff further objected that "Northwestern is not permitted to obtain additional information that it could have sought during the underwriting and application process or during the claim process." (*Id.*). Despite these objections, Plaintiff responded that she suffers from a brain injury

that limits her memory and she cannot recall everything in the ten years preceding her Policy application to the present. (*Id.*). Plaintiff maintained, however, that she provided a release to Defendant in 2021 and again during the claim process. (*Id.*). Later, Plaintiff supplemented her objection to this request to state that the burden to respond is substantially the same, if not easier, for Defendant to obtain the records. (*Id.* at PageID # 162).

Defendant now seeks compulsion of the identities of Plaintiff's medical providers and an executed authorization for her treatment records. (DN 27). According to Defendant, Plaintiff indicated on her medical questionnaire when applying for the Policy that she had not been diagnosed with or treated for anxiety or any spine disorder in the past 10 years. (*Id.* at PageID # 145-46). Defendant says that when Plaintiff submitted her claim for benefits, it reviewed records from one of Plaintiff's providers that revealed information Plaintiff had not disclosed on her questionnaire, including diagnoses, treatments, and prescription medications for anxiety and spine issues. (*Id.*). Because Plaintiff did not disclose her full medical history, Defendant argues that the identities of her providers and her treatment records are directly relevant to its rescission claim. (*Id.*).

Plaintiff characterizes Defendant's requested compulsion of this information to be "specious" and "harassing" since memory issues are a symptom of her disability. (DN 29, at PageID # 240). Per Plaintiff, she has answered the request to the best of her ability given her memory limitations, and she previously provided a medical authorization for release of records when she applied for the Policy in 2021. (*Id.* at PageID # 240-41). Plaintiff further states she provided all medical records in her possession, including a 54-page "Milliman IntelliScript Irix report" from January 25, 2024, which includes a detailed history of her prescriptions, doctors, and pharmacies. (*Id.*). There is nothing more for the Court to compel, in Plaintiff's opinion.

In reply, Defendant emphasizes that Plaintiff opened the door for discovery on her medical history by placing it at issue. (DN 31, at PageID # 342-43 (citing *Powell v. Tosh*, 5:09-CV-121-TBR, 2011 WL 13210026, at *3 (W.D. Ky. Aug. 2, 2011); *Birdsong v. Bishop*, 06-CV-297-JMH, 2007 WL 4571308, at *4 (E.D. Ky. Dec. 27, 2007)).

The Court agrees that Plaintiff placed her medical conditions at issue by filing this breach-of-contract action. But the Court doubts whether Plaintiff's additional medical records, if they even exist, are proportional to the needs to this case. Defendant discovered information in support of rescinding the insurance policy during the claim-review process. As described in its counterclaim, Defendant "received medical records from various providers revealing undisclosed medical information including, among other things, treatment for back pain, neck pain, and myofascial pain from September 2019 through February 2021[,]" as well as "undisclosed medical information revealing treatment for anxiety disorder, ADHD, and other undisclosed conditions." (DN 7, at PageID # 46, ¶¶ 16-17).

Even if Plaintiff will not execute a new medical authorization, Defendant can glean provider names from the medical records and information received during the claim-review process and subpoena such providers for any additional records.[2] Because Plaintiff represents that she has produced all providers to the best of her memory and produced all medical records in her possession, the Court will not compel Plaintiff to produce additional information in response to this Request.

---

[2] Although Plaintiff claims she already signed medical releases for Defendant during the Policy application process and during the claims process, the release within her application will expire on November 14, 2025. (*See* DN 29-1, at PageID # 252 (document signed on November 14, 2023, with language indicating authorization "is valid for 24 months (2 years) from the date it is signed."). And the copy of the release from the claims process that Plaintiff submits is not signed or dated. (*See* DN 29-3).

B. Discovery of Plaintiff's "Notebooks"

Defendant also seeks to discover notebooks that Plaintiff references in calls she recorded of herself speaking with Defendant's representatives. (DN 27, at PageID # 146-48). Defendant previously requested Plaintiff "produce all documents that reflect any conversation, telephone call, or other verbal communication between you and any other person concerning any matter referred to in the Complaint or relating to the application for insurance which is the subject of the Complaint. (DN 27-1, at PageID # 156). Plaintiff objected that this request "seeks privilege work product and/or subject to attorney/client privilege." (*Id.*). Later, Plaintiff provided a supplemental objection, stating that the request was:

> overly broad and unduly burdensome. As it relates to the 'notebook' Mrs. King has referenced in recordings, she maintains multiple notebooks which mostly contain information wholly unrelated to this case. The time and expense of going through the multiple notebooks for the minimal notes she may have made concerning this case and conversations she may have had are greatly outweighed by the substantial invasion of privacy and minimal probative value – especially where the recordings provided to Defendant are the best evidence of what occurred during the phone calls.

(*Id.* at PageID # 163).

Now, Defendant seeks compulsion of the notebooks because they appear to include entries relating to Plaintiff's application for the Policy and/or the claims process. (DN 27, at PageID # 147). These notebooks, according to Defendant, are particularly significant due to Plaintiff's persistent assertions that her brain injury prevents her from recalling anything from the ten years before she applied for the Policy to the present. (*Id.* at PageID # 147-48). That the notebooks may contain some material irrelevant to this lawsuit does not render them undiscoverable, Defendant argues. (*Id.*).

8

Plaintiff responds that Defendant is only speculating on whether information from the notebooks would provide evidence as to whether Plaintiff made material misrepresentations in her Policy application that for which Defendant would not have issued the Policy. (DN 29, at PageID # 244-46). Per Plaintiff, requiring wholesale production of her notebooks would be an invasion of her privacy. (*Id.*). Even production of only the relevant portions of the notebooks would be unduly burdensome, Plaintiff argues, because at least five notebooks exist, and the burden of reviewing such notebooks to find any potentially relevant entries would sufficiently outweigh any probative value. (*Id.* at PageID # 248). Plaintiff maintains the audio recordings of the calls are the "best evidence" of what happened during the calls and that nothing in the notebooks would alter this evidence. (*Id.*).

Defendant's reply reiterates that relevant portions of Plaintiff's notebooks are discoverable but agrees that any privileged information could be logged and redacted. (DN 31, at PageID # 344-45). Defendant has no issue with maintaining Plaintiff's privacy as to irrelevant material. (*Id.*). As to Plaintiff's burden in reviewing the notebooks for relevant material, Defendant challenges such review is minimal in the context of the 10,000 documents Defendant has reviewed in the case and that Plaintiff likely already conducted a preliminary review to raise her privacy concerns. (*Id.* at PageID # 345-46).

Because Plaintiff stated she was maintaining notebooks concerning her communications with Defendant during calls with Defendant's representatives, such notations are relevant to Defendant's rescission counterclaim. But the Court agrees that wholesale production of the notebooks could implicate Plaintiff's privacy concerns and reveal information irrelevant to the claims in this case. Accordingly, Plaintiff must review her notebooks and produce copies of pages with information relating to her calls with Defendant's representatives. The likely benefit of

Defendant obtaining this information outweighs Plaintiff's burden of review. Though Plaintiff asserts the audio recordings are the "best evidence," Plaintiff has not represented that any notebook entries state the content of the calls verbatim. Defendant has no other means of obtaining the notebook entries. To the extent Plaintiff feels any responsive portions of the notebook are privileged, Plaintiff must log and redact such material from her production.

Plaintiff must produce copies of the relevant portions of her notebooks within fourteen (14) days entry of this Order.

### V. Plaintiff's Motion to Compel (DN 28)

#### A. Production of ESI in Native Format

The Scheduling Order in this case, entered by the Court on February 27, 2025, provided that "[p]ursuant to Rule 34 . . . ESI shall be produced in searchable PDF format unless otherwise agreed to by the parties[.]" (DN 14). Rather than attempting to reach an agreement with Defendant, Plaintiff's discovery definitions and instructions regarding ESI unilaterally provided that "relevant evidence (or information that may lead to discovery of relevant evidence) in the form of ESI may consist of operating systems, applications and other executables, and computer-generated information, all in their native, electronic format ("Digital Evidence."). (DN 28-1). Plaintiff's definitions further stated that:

> ESI shall be produced in native format. Under no circumstances should ESI be converted from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome to use the ESI. ESI should not be produced in a form that removes or significantly degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means.

> Email should be produced in PST format. Emails should show the sending party, and include all addresses, subject lines, dates, times, attachments, metadata, and email strings . . .

(DN 28-1, at PageID # 190-91).

Defendant generally objected to the "instructions and definitions" portion of Plaintiff's requests for production "to the extent they purport to impose any obligation on Northwestern Mutual greater than the obligations imposed by the Federal Rules of Civil Procedure." (DN 34-1, at PageID # 367). Defendant later supplemented its objection to Plaintiff's "definition of 'ESI' and the related instructions to the extent that they purport to impose any obligation on Northwestern Mutual greater than the obligations imposed by the Federal Rules of Civil Procedure." (*Id.* at PageID # 395). Defendant stated that "all material responsive to Plaintiff's request for production has been produced in document form." (*Id.*at PageID # 395). Defendant then supplemented its objections a third time, objecting to the extent that Plaintiff was imposing obligations greater than the Scheduling Order entered on February 27, 2025 and stating that "all material responsive to Plaintiff's request for production has been produced in "searchable PDF format" as required by that order." (DN 28-2, at PageID # 398-99).

Plaintiff now argues that Defendant violated her request that ESI be produced in native format by reducing its discovery to .pdf format. (DN 28, at PageID # 168-70). According to Plaintiff, Defendant's production of the documents in another format makes it impossible for Plaintiff to discern whether the evidence was altered. (*Id.*).

Defendant responds that Plaintiff's ESI instruction was "extraordinarily burdensome" and directly contravenes the Court's directive from the Scheduling Order that ESI should be produced in searchable PDF format unless otherwise agreed to by the Parties. (DN 30, at PageID # 315 (citing DN 28-1; DN 14)). Defendant accuses Plaintiff of attempting to access metadata from discovery documents, which Plaintiff has not demonstrated is relevant to her breach-of-contract claims. (*Id.* at PageID # 315-16). Giving Plaintiff the "native format" she requests, Defendants

11

explain, would require giving Plaintiff access to a live DI Connection platform utilized by Defendant, which is burdensome and not workable. (*Id.*). Defendant believes Plaintiff's position is contrary to caselaw demonstrating a general presumption against the production of metadata. (*Id.* (citing *Kentucky Speedway, LLC v. Nat. Assoc. of Stock Car Auto Racing*, No. 05-138-WOB, 2006 WL 5097354, at *8 (E.D. Ky. Dec. 18, 2006)). Defendant maintains it has fully complied with the Court's Order by producing ESI in searchable .pdf format. (*Id.* at PageID # 317).

In reply, Plaintiff accuses Defendant of ignoring Federal Rule of Civil Procedure 34(b), which permits a party to request documents, including ESI, to be produced in a specific manner. (DN 32, at PageID # 349). Plaintiff further argues that providing emails in native format is "generally as simple as dragging and dropping them to a folder." (*Id.*). The requested documents in their native format are necessary, Plaintiff continues, because they revolve around the contract formation (i.e., application process) in the case – which is a central issue to her breach-of-contract claim and Defendant's rescission claim. (*Id.*). Plaintiff reiterates that its ESI request was proper, and Defendant should be required to comply. (*Id.* at PageID # 350).

Regardless of whether metadata is generally discoverable or not, Plaintiff's unilateral instructions to Defendant regarding ESI violated the Scheduling Order's requirement that "ESI shall be produced in a searchable PDF format *unless otherwise agreed to by the Parties.*" (DN 14 (emphasis added)). Plaintiff did not raise any concerns as to the format of ESI during the Rule 16 Scheduling Conference or following entry of the Scheduling Order. Plaintiff's attempt to change the landscape of discovery, without conferring with Defendant to reach an agreement, fails. Accordingly, the Court finds Defendant fulfilled its obligations in producing ESI by doing so in searchable PDF format, in compliance with the Scheduling Order, and will not be compelled to produce such documents in a different format.

B. Defendant's Failure to State Whether Responsive Documents Exist

Plaintiff next alleges that Defendant has failed to state whether it is withholding documents based on each boilerplate objection it has asserted to Plaintiff's requests. (DN 28, at PageID # 170). Plaintiff believes Defendant should be instructed to provide complaint responses. (*Id.* at PageID # 170-71).

Defendant asserts that Plaintiff fails to identify any specific discovery request response that is deficient under Rule 34(b)(2)(C). (DN 30, at PageID # 317). Any Rule 34(b)(2)(C) issue, Defendant clarifies, stems from the overbreadth and vagueness of Plaintiff's requests. (*Id.*). Even so, Defendant argues that after stating its objections it identified specific Bates numbers for documents within the scope of the request and that if no documents fell within the scope, the response so stated. (*Id.* at PageID # 318). And Defendant explains its objections made evident that documents were being withheld based on the identified objection. (*Id.*).

Plaintiff, in reply, submits that all of Defendant's responses suffer the same Rule 34(b)(2)(C) deficiencies. (DN 32, at PageID # 351-52). According to Plaintiff, cursory review of Defendant's responses reveals that Defendant did not state whether responsive documents were being withheld based on its boilerplate objections. (*Id.*).

Rule 34 requires parties to "state with specificity the grounds for objecting to the request, including the reasons." *Id.* Subsection (b)(2)(C) of the Rule further requires that objections to discovery requests state "whether any responsive materials are being withheld on the basis of that objection." *Id.* Boilerplate objections, that merely state legal grounds for objection without specifying deficiency or harm, are plainly disallowed by Rule 34(b)(2)(B).

Plaintiff is correct that Defendant provided boilerplate objections to nearly every request for production and did not explicitly state whether it was withholding responsive documents based

on these boilerplate objections. But Defendant did not assert only boilerplate objections. Each response included additional objections, i.e., that the requested documents were relevant only to Plaintiff's stayed bad faith claim, that contractual obligations with third parties prohibited disclosure, that responsive documents violate third-party privacy, etc. Then, at the end of each response, Defendant either identified specific Bates-numbered documents that were responsive or stated with specificity why responsive documents were not produced. In this vein, Defendant's responses comply with Rule 34(b)(2)(B) and (C), and the Court will not require Defendant to state whether it is withholding documents pursuant to each boilerplate objection. The Court, however, will address Plaintiff's issues with Defendant's specific objections below.

### C. Plaintiff's RFP Nos, 11, 15, 26-33, 35-40

Plaintiff next challenges the propriety of Defendant's objections and the sufficiency of Defendant's responses to sixteen Requests for Production (RFPs).

### i. Plaintiff's RFP Nos. 26-33, 35-40

Defendant objected to many of the requests that Plaintiff challenges here by stating that responsive information was solely relevant to Plaintiff's bad-faith claims, which are bifurcated from the Plaintiff's breach-of contract claim and Defendant's rescission counterclaim. Plaintiff appears to argue that Defendant's rescission counterclaim expands the scope of discovery beyond the limited scope of traditional breach-of-contract claims. Broadly, Plaintiff believes it is entitled to discover "what Defendant knew" and "when Defendant knew it" to determine Defendant's motive, bias, and credibility and whether Defendant would not have issued the Policy had it known of Plaintiff's undisclosed medical conditions. (DN 28, at PageID # 181-85). To obtain this information, Plaintiff issued requests seeking each document and ESI detailing or discussing:

- Defendant's practices, policies, procedures, and training provided to employees, contractors, representatives, and agents to follow in the administration of disability

insurance contestability reviews, and the bases, reasons, and rationale underlying such policies (RDP. No. 26)

- Defendant's practices, policies, procedures, and training provided to employees, contractors, representatives, and agents to follow in the underwriting of disability insurance applications, and the bases, reasons, and rationale underlying such polices (RFP No. 27)
- Defendant's practices, policies, procedures, and training provided to employees, contractors, representatives, and agents to follow in the post-issue administration and underwriting review of inforce [sic] disability insurance policies, and the bases, reasons, and rational underlying such policies (RFP No. 28).
- Defendant's practices, policies, procedures, and training provided to employees, contractors, representatives, and agents to follow in the solicitation, sale, and application process for disability insurance coverage, and the bases reasons, and rational underlying such policies (RFP No. 29).
- The training Defendant provided to Ralph Barringer relating to the solicitation, sale, application, and delivery process for the Policy. (RFP No. 30).
- The training Defendant provided to Tamara Kraus relating to the solicitation, sale, application, and delivery process for the Policy. (RFP No. 31).
- Defendant's contracting with, and appointment in Kentucky, of Ralph Barringer. (RFP No. 32).
- Defendant's contracting with, and appointment in Kentucky, of Tamara Kraus. (RFP No. 33).
- The training provided to Defendant's claims personnel for the administration of disability claims. (RFP No. 35).
- Defendant's compensation practices for disability claim personnel, including all employee incentive, bonus, or reward programs. (RFP No. 36).
- Defendant's performance review procedures for disability claim personnel as it relates to the quality and accuracy of claim administration and decisions, as well as it relates to employment reviews (e.g., merit increases, raises, promotion, job rating and retention, etc.) (RFP No. 37).
- The employee file for each person involved with Defendant's decision to deny Plaintiff's claim for Policy benefits – personal information such as medical records, employee benefit designations need not be produced and SSN and DOB may be redacted – to include performance reviews, audits, job title, job description, decision-making authority, and supervisor(s). (RFP No. 38).
- The employee file for each person involved with Defendant's decision to rescind the Policy – personal information such as medical records, employee benefit designations need not be produced and SSN and DOB may be redacted – to include performance reviews, audits, job title, job description, decision-making authority, and supervisor(s). (RFP No. 39).
- Defendant's Market Conduct Annual Statement ("MCAS") filings for disability insurance for the calendar years 2019-2024 – limited to Kentucky. (RFP No. 40).

(DN 28-1, at PageID # 194-196).

Starting with RFP Nos. 26-31, Defendant's practices, policies, procedures, and training in various areas (RFP Nos. 26-31) are relevant to Plaintiff's bifurcated bad-faith claims. *See Meador v. Indiana Ins. Co.*, No. 1:05CV-00206-TBR, 2006 WL 8457433, at *8 n. 14 (W.D. Ky. May 12, 2006) (discovery sought in these requests is relevant, within the meaning of Rule 26(b)(1), to the question of whether Indiana Insurance's own polices, as described in the manuals, embody or encourage bad faith practices); *see also Sutter v. Am. Fam. Ins. Co.*, No 1:20-cv-974, 2022 WL 1611796, at *4 n.4 (S.D. Ohio May 20, 2022) ("training and policy manuals are relevant in determining whether an insurance company lacked a 'reasonable justification' when investigating a UIM claim by misrepresenting, or not abiding by, the written policy provisions.").

It is less clear whether these categories of documents bear relevance to Plaintiff's breach-of-contract claim and Defendant's rescission counterclaim. Some courts have noted that policy manuals "are relevant to a breach of contract claim to the extent there is an ambiguity in the contract requiring extrinsic evidence." *Sutter v. Am. Fam. Ins. Co.*, No 1:20-cv-974, 2022 WL 1611796, at *4 n.4 (S.D. Ohio May 20, 2022)(citing *U.S. Fire Ins. Co. v. City of Warren*, No. 2:10-cv-13128, 2012 WL 1454008, at *9 (E.D. Mich. Apr. 26, 2021) ("[A]n insurance company's internal claims manual or claims processing guidelines may contain information relevant to resolving any ambiguities in the contract, such as the company's course of dealing or insurance industry practice.")). In *John R. Springs, Inc. v. Affiliated FM Insurance Company*, the Eastern District of Michigan determined that where there was no bad faith claim and no finding of ambiguity, the defendant insurer's claims manual and guidelines regarding its claims handling process were not relevant. No. 20-11536, 2022 WL 19184, at *2 (E.D. Mich. Jan. 3, 2022). The court reasoned that "this type of discovery request could lead to a fishing expedition." *Id.* (citing *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 321 F.R.D. 107, 117-18 (M.D. Pa.

2017)). Similarly, in another Eastern District of Michigan case, *Lanz v. State Farm Mutual Automobile Insurance Company,* the court determined that training of claims personnel and manuals to demonstrate that the defendant insurer handled plaintiff's claim in an unreasonable and unfair fashion, were not relevant to plaintiff's coverage and contractual claims. 2014 WL 6974856, at *4 (E.D. Mich. Dec. 9, 2014) ("these are objective questions to which [d]efendant's good or bad faith and handling of other claims has no bearing.").

Like in *Lanz*, the questions from Plaintiff's breach-of-contract claim and Defendant's rescission claim are objective. The claims together boil down to whether Plaintiff's contractual policy with Defendant was valid. Defendant's alleged bad faith does not bear on these claims. Nor is Defendant's motive relevant to these claims. *See, e.g., Veritiv Operating Co. v. Phoenix Paper Wickliffe, LLC*, No. 5:21-CV-00170-BJB-HBB, 2023 WL 2975868, at *8 (W.D. Ky. Apr. 17, 2023) ("A party's state of mind or motive is not material when determining if a contract was breached . . . .") (citing *Advanced Accessory Sys., LLC v. Gibbs*, 71 F. App'x 454, 466 (6th Cir. 2003) (citation omitted)). Evidence regarding bias neither proves nor disproves the existence of coverage or contractual interpretation. *See Pollock v. State Farm Mut. Auto Ins. Co.*, No. 2:11-cv-581, 2013 WL 1150734, at *7 (S.D. Ohio Mar. 19, 2013). And Plaintiff has not alleged the Policy is ambiguous.

The Court agrees that Plaintiff's defense to rescission permits discovery into "what Defendant knew" and "when Defendant knew it," but requests for Defendant's practices, policies, procedures, and training go beyond this inquiry. Accordingly, the Court will not compel Defendant to produce any additional responsive documents to RFP Nos. 26-31.

Turning to RFP Nos. 36-37, courts have also consistently found employee compensation practices, incentive or rewards programs, and performance review procedures (RFP Nos. 36 and

37) to be relevant to claims of bad faith. *See, e.g., Sutter v. Am. Fam. Ins. Co.*, No. 1:20-cv-974, 2022 WL 1611796, at *6 (S.D. Ohio May 20, 2022) ("Courts have found employee compensation plans and incentive information relevant in determining the motivation underlying employees' actions in handling bad faith claims") (citing *Solano-Sanchez v. State Farm Mut. Auto Ins. Co.*, No. 19-4016, 2021 WL 229400, at *12 (E.D. Pa. Jan. 22, 2021) (finding "employee incentives to close out insureds' claims, or handle claims in a particular manner relevant to bad faith claims.")); *see also Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 815 (Ky. 2004) ("portions of personnel records related to job performance and disciplinary matters" could show insurance company's knowledge and approval of bad faith practices"). But these courts have not spoken on whether these categories of documents could be relevant to underlying coverage and contractual issues. Plaintiff says this information is inherently relevant to her breach of contract claim because it goes "to the credibility of the persons who made the decision to deny her claim and any biases." As discussed above, motive, credibility, and bias are not relevant to determining contractual issues. Nor does this information bear on what Defendant knew during Plaintiff's application process and when the Policy issued. Accordingly, Defendants will not be compelled to provide additional documents responsive to RFP Nos. 36 and 37.

The same reasoning for denying discovery responsive to RFP Nos. 26-31 and 36-37 applies to the employee personnel files and contract information Plaintiff is attempting to access (RFP Nos. 32, 33, 38 and 39). Defendant will not be compelled to produce employee files of the individuals that handled Plaintiff's claim. Such information is only relevant to Plaintiff's bifurcated bad faith claims.

The final RFP that Defendant objected to as being only relevant to Plaintiff's bifurcated bad faith claims is RFP No. 40, which requested Defendant's Market Conduct Annual Statement

("MCAS"). Plaintiff urges that the volume of disability business Defendant conducts in Kentucky, as well as the claim denials and policy rescissions, are "inherently relevant to its bias and credibility." (DN 28, at PageID # 185). Courts have disagreed. *See, e.g., First Horizon Nat. Corp. v. Houston Cas. Co.*, 2:15-cv-2235-SHL-dkv, 2016 WL5869580, at *8 (W.D. Tenn. Oct. 5, 2016) (stating that "[d]efendants' conduct in other cases is not before the court; what is before the court is the [d]efendants' conduct toward the [p]laintiffs in this case . . . [t]he [d]efendants' conduct and positions they took in other insurance claims is of no consequence to the instant case.") (citing *Moses v. State Farm Mut. Auto Ins. Co.*, 104 F.R.D. 55, 57 (N.D. Ga. 1984)). Again, bias and credibility are not relevant to contractual claims. Defendant's volume of business and actions relating to such business are not relevant to the contractual claims currently before the Court.

As the Court noted when granting bifurcation of Plaintiff's bad faith claims, bifurcation is meant to "promote judicial efficiency, limit jury confusion, and mitigate possible prejudice toward [Defendant]." (DN 15). Allowing the broad discovery Plaintiff currently seeks does not bear relevance to the contractual claims and does not align with the policies behind bifurcation. The Court, therefore, denies Plaintiff's Motion to Compel as to RFP Nos. 26-31, 36-39, and 40.

ii. Plaintiff's RFP No. 11

This request asked Plaintiff to produce "[e]ach document and ESI relating to, referring to, or discussing Defendant's agreement with, contract with, or subscription to, Milliman, including Irix® Rules Engine, Irix® Prescription Data, Irix® Medical Data, Irix® Recheck, Irix® Risk Score I Mortality, and Irix® Risk Score Morbidity." (DN 28-1, at PageID # 193). Defendant objected to this request based on vagueness, broadness, relevancy, and undue burden but stated that relevant documents within the scope of Plaintiff's request were produced at Bates NM0010605-NM00010655. (*Id.*).

In Plaintiff's view, the requested documents are relevant to Defendant's decision to rescind Plaintiff's policy and specifically to when Defendant obtained information about Plaintiff's prescription data, medical history, and criminal history through Milliman. (DN 28, at PageID # 171-72). Plaintiff says the only responsive documents Defendant produced were eleven pages from a Milliman report obtained in January 2024, but Defendant has failed to provide its agreement with Milliman and its subscription. (*Id.*). None of this information, Plaintiff alleges, is disproportional to the needs of this case because it is all electronic and "other insurers regularly produce these same documents in discovery without issue." (*Id.* at Paged # 172-73).

Defendant reiterates that its relationship and agreement with Milliman and the six Milliman products identified in RFP No. 11 have no relevance to Plaintiff's breach-of-contract claim. (DN 30, at PageID # 318-19). Even so, Defendant explains it produced the only Milliman report relating to Plaintiff's claim in response to RFP No. 11. (*Id.*). As for the specificity of its objections, Defendant claims it was as specific as possible given that the request was overbroad and sought material regarding Milliman products not used with Plaintiff's claim. (*Id.*).

In reply, Plaintiff asserts that Defendant's underwriting requires it to produce an IntelliScript Report, but it has not produced such a document to Plaintiff. (*Id.* at PageID # 352). Because Defendant will not produce its agreement and subscription with Milliman and Milliman's products, Plaintiff claims it is impossible to know if Defendant's allegations regarding relevancy are true. (*Id.*). Plaintiff emphasizes that RFP No. 11 is geared at what Defendant knew, when it knew it, and what Defendant could have learned had it investigated. (*Id.* at PageID # 352-53).

Defendant avers it produced the only Milliman report in its possession responsive to Plaintiff's request. And Defendant's contracts/agreements/subscriptions with Milliman do not bear on what Defendant knew when issuing Plaintiff's application. Because Defendant's sworn

discovery responses indicate it has no other Milliman report relating to Plaintiff's claims, Defendant will not be compelled to produce anything else in response to RFP No. 11.

### iii. Plaintiff's RFP No. 15

Plaintiff's RFP No. 15 requested Defendant produce "[e]ach document and ESI relating to, referring to, or discussing guidelines, manuals, and procedures for the review, use, interpretation, and translation of codes, of a[n] MIB report." (DN 28-1, at PageID # 194). Defendant again objected to the request as vague, overly broad, irrelevant, unduly burdensome, and confidential. (DN 28-2, at PageID # 206, 220, 231). Defendant ultimately did not produce any responsive material, stating its contract with the Medical Insurance Bureau (MIB) prohibited it from doing so. (*Id.*).

Plaintiff says that without the requested information, the MIB reports produced are unintelligible and largely useless. (DN 28, at PageID # 174).  The information is relevant, Plaintiff asserts, to determining how Defendant obtains and uses data from MIB, another company who regularly provides insurance companies with information about applicants. (*Id.*). Plaintiff believes Defendant is falsely claiming that it is contractually prohibited from producing these materials. (*Id.*). Plaintiff explains Defendant should have sought MIB's express written approval, in accordance with their contract, to properly respond to Plaintiff's discovery requests. (*Id.*).

Defendant provides an affidavit from counsel, stating that it sought MIB's permission to provide the confidential information Plaintiff requests, but MIB "would not consent to the production of the requested information." (*See* DN 30-1). Defendant emphasizes that even if MIB had agreed to production, the material is not relevant because Defendant's alleged use of MIB data has nothing to do with whether Plaintiff's representations of her medical history were accurate – the only issue to the claims currently before the Court. (DN 30, at PageID # 320).

Plaintiff, in reply, questions whether Defendant's request to MIB to allow production of the information suggested use of a confidentiality agreement. (DN 32, at PageID # 354). Plaintiff urges that she should not be deprived of relevant information based on Defendant's third-party contract. (*Id.*). The information and codes are relevant to Defendant's rescission claim, Plaintiff argues, because they can shine light on what information Defendant had related to Plaintiff's application. (*Id.*).

Private non-disclosure agreements "cannot limit a court's ability to order discovery of relevant evidence." *O'Hara & Assocs., LLC v. Winzeler, Inc.*, No. 16-11708, 2017 WL 11423043, at *2 (E.D. Mich. Aug. 4, 2017); *see also Waskul v. Washtenaw Cnty. Community Mental Health*, 569 F.Supp.3d 626, 640 (E.D. Mich. 2021) ("A confidentiality agreement cannot bind a federal court."). This principle underscores that discovery obligations are governed by legal standards, not private contracts. Holding otherwise would allow parties, through private agreements, to "create new privileges against discovery orders no matter how relevant the material in question may be." *O'Hara*, 2017 WL 11423043, at *2; *see also B.L. v. Schumann*, No. 3:18-CV-151-RGJ-CHL, 2020 WL 3145692, at *4-5 (W.D. Ky. June 12, 2020) (rejecting argument that Rule 45 subpoena should be quashed because of confidentiality agreement); *I.E.E. Int'l Elecs. & Eng'g, S.A. v. TK Holdings Inc.*, No. 10-123487, 2013 WL 12183637, at *1 (E.D. Mich. June 24, 2013) (emphasizing that allowing confidentiality agreements to bar discovery would undermine the truth-seeking function of discovery and empower corporations to avoid discovery). Based on these principles, Defendant's objection to producing the requested documents based on its contract with MIB and MIB's refusal is not valid.

Even so, the documents Plaintiff requests are not relevant to Plaintiff's breach-of-contract claim or Defendant's rescission claim. As has been noted throughout this Opinion, Defendant's

rescission counterclaim permits Plaintiff to discover what Defendant knew and when they knew it during the application process. *See Burchfield*, 394 S.W.2d at 470. But Plaintiff discovered what Defendant knew about any MIB reports used in assessing Plaintiff's application when it requested such information in RFP Nos. 13 and 14. (*See* DN 26-2, at PageID # 410-11). Defendant produced documents responsive to these requests, and Plaintiff does not now challenge the sufficiency of those productions. (*Id.*).

Instead, Plaintiff's RFP No. 15 attempts to extend its entitlement to what Defendant knew at the time of Plaintiff's application to what Defendant generally knows about MIB reports and how such reports are used and handled. This goes too far. At this juncture, Plaintiff is not entitled to discover guidelines, manuals, and procedures for the review, use, interpretation, and translation of codes, of a[n] MIB report." Accordingly, the Court will not compel Defendant to further respond to RFP No. 15.

## **ORDER**

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel (DN 27) is **GRANTED in part** and **DENIED in part** as discussed above. Plaintiff shall produce copies of relevant portions of her notebooks to Defendant within fourteen (14) days entry of this Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Compel (DN 28) is **DENIED.**

Regina S. Edwards, Magistrate Judge
United States District Court

September 30, 2025

Copies:        Counsel of Record